THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

———————————

IRMA MARTINEZ, FELIPE MARTINEZ,
LARRY MUNN , and
LEE HUNT, *as personal representative
of the estate of Abel Portillo*, *deceased*,

      Plaintiffs,

vs.                                                    Case No. 1:17-cv-00922 KWR/JFR

CONTINENTAL TIRE THE AMERICAS,
LLC, *An Ohio Limited Liability Company*

    Defendant.

## <u>REDACTED FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

THIS MATTER comes before the Court following a two-week bench trial. This order constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a). Having reviewed the evidence, testimony, and arguments of counsel, the Court concludes Defendant is not liable on all remaining counts. The Court will enter judgment in Defendant's favor.

This is a products liability and negligence case. Plaintiffs assert that a tread-belt detachment or separation of a tire manufactured by Defendant (the "subject tire") caused a truck occupied by Plaintiffs and Mr. Portillo to rollover. Plaintiffs Larry Munn and Felipe Martinez were injured, and Mr. Portillo died.[1] Ms. Martinez asserts loss of consortium, and Lee Hunt represents Mr. Portillo's wrongful death estate.

---

[1] Plaintiff Jose Prieto, who was also in the truck at the time of the crash settled his claims and did not participate in the bench trial. When the Court refers to "Plaintiffs" in this order, it does not refer to Mr. Prieto.

Plaintiffs assert that the subject tire had a manufacturing or design defect which caused the tread-belt separation. Weighing and evaluating the record, the Court finds (1) that there was no design or manufacturing defect, and (2) a design or manufacturing defect did not cause the tread-belt separation.   Moreover, the Court concludes that Defendant exercised ordinary care and was not negligent.

Therefore, the Court finds Defendant not liable on all remaining claims, including (1) strict products liability (Count 1), (2) negligence (Count II), and (3) loss of consortium (Count VI).

## PROCEDURAL BACKGROUND

On August 2, 2017, Plaintiffs filed a complaint for wrongful death and personal injuries. In April 2020, Plaintiffs agreed to the dismissal of Counts III, IV, and V. *See* Doc. 373 (stipulated order of dismissal).  Therefore, it appears that the following claims remain:

Count I: Strict Products Liability
Count II: Negligence (causing death and injury)
Count VI: Loss of Consortium (as to Plaintiff Irma Martinez)
The parties withdrew their jury demand and agreed to the undersigned conducting a bench trial.  *See* **Docs. 586, 587, 588**.  The Court issued numerous rulings prior to trial.  The parties are already familiar with those rulings, therefore the Court will not repeat them.

The Court held a two-week trial beginning July 18, 2022.  The Court directed the parties to submit written closing and proposed findings of fact and conclusions of law, citing to the official transcript.

Based on the parties' stipulations and written closing, the evidence and testimony admitted at trial, and the deposition testimony designated by the parties and admitted by the Court, the Court makes the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).

## LEGAL STANDARD

When a matter proceeds to a bench trial, the trial court sits as the finder-of-fact. *Soto v. Jurado*, 166 F.3d 1222, 1998 WL 911693, at *2 (10th Cir. 1998) (table); *Bellitto v. Snipes*, 935 F.3d 1192, 1209 (11th Cir. 2019).   In its capacity as trier-of-fact, the trial court must determine which of the witnesses it finds credible, which of the permissible competing inferences it will draw, and whether the party having the burden of proof has satisfactorily proven its case. *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 215 (2d Cir. 2001).

## FINDINGS OF FACT[2]

### A.      Stipulations from Pretrial Order (Doc. 681).

The parties stipulated to certain facts, which the Court accepts as true.

1. This case arises out of a one-vehicle rollover crash that occurred on February 18, 2016 while Plaintiffs and Plaintiffs' decedent were traveling eastbound on Highway 70 east of Roswell, New Mexico.  (the "crash").  Doc. 681 at 9.

2. The vehicle involved in the crash was a 2015 Ford F-350 Super Duty pickup truck bearing Vehicle Identification number 1FT7W3A66FEA86864 (the "work truck").  *Id.* at 9.

3. The left rear tire on the work truck in which Plaintiffs were traveling experienced a disablement before the crash.  *Id.* at 10.

4. Abel Portillo died, and Plaintiffs Felipe Martinez, Larry Munn, and Jose Prieto were injured in the rollover crash.  *Id*.

5. The left rear tire that underwent the tire disablement was a General Grabber HTS light truck tire, size LT245/75R17 LR-E.  *Id*.

---

[2] The Court was tasked in part with weighing competing evidence, testimony, or expert opinions, and resolving factual disputes between competing evidence. The Court resolved any factual disputes or contrary expert opinion testimony in manner consistent with the findings herein.

6. The tire was designed, manufactured, and distributed by Defendant Continental Tire The Americas. *Id.*

7. Tire manufacturers are required to place a number on each tire under U.S. Department of Transportation ("DOT") rules, known as a "DOT number," which provides certain information about the tire such as its manufacture date. The full DOT number for the left rear tire that underwent the disablement was destroyed in the crash, but Defendant has identified the tire as having the partial DOT number of A343HM64 and as having the root article number of 0450184. *Id.*

8. General Grabber HTS light truck tires, size LT245/75R17 LR-E, with the root article number 0450184 were only manufactured at Defendant's Mt. Vernon manufacturing plant. *Id.*

9. The left rear tire that underwent the disablement was mounted on a full-size spare wheel that did not have a tire pressure monitoring system ("TPMS") sensor. *Id.*

10. The left front tire on the work truck on the day of the crash was a General Grabber HTS, size LT245/75R17 with DOT number A343HM642414, which indicates that it was manufactured the 24th week of 2014. *Id.*

11. The work truck was manufactured on June 20, 2014 and purchased new by Plaintiffs' employer Trac-Work, Inc. ("Trac-Work"). *Id.* at 10.

12. The work truck's mileage was recorded as 33,004 during an oil change on September 28, 2015. *Id.*

13. The work truck's mileage at the time of the crash was 49,963. *Id.* at 11

14. The work truck was pulling a 16-foot utility trailer at the time of the crash. *Id.*

15. A crash data download from the work truck showed that it was traveling at approximately 93 miles per hour at the start of the tire disablement. *Id.*

4

16. Felipe Martinez was the driver of the work truck on the day of the crash, Larry Munn was seated in the front passenger seat, Abel Portillo was seated in the left rear seat, Jose Prieto was seated in the right rear seat. *Id*.

17. At the time of the crash, Plaintiff Felipe Martinez was the Trac-Work foreman and Larry Munn, Jose Prieto, and Abel Portillo were laborers. *Id.*

18. The New Mexico State police responded to the crash and took photos of the scene an authentic copy of which has been identified as Defendant exhibit 1024. Doc. 681 at 11.

19. The office of Medical Investigator's ("OMI") Report of Finding, Case No. 2016-01013 regarding Abel Portillo identified at CTA 1472, the CT scans at CTA 1473 are authentic copies of the report and the CT scan produced by OMI in connection with their investigation of the subject crash.

### B.      Subject tire and truck.

20. At the time of the accident, Plaintiffs and Mr. Portillo worked for Trac-Work, which services, builds, and repairs railroad tracks. Dep. of Robert Favors at 26:14-15. Plaintiffs drove Trac-Work supplied trucks off-road to service the railroad tracks. Dep. of Robert Favors at 33-34. Trac-Work vehicles have had tire failures due to the surfaces the trucks drive on. *Id.* at 34:7-9; 19-20.

21. The vehicle at issue was an F-350 Super Duty crew cab, which was owned by Plaintiffs' employer, Trac-Work, Inc. The vehicle was produced on or around June 20, 2014, and it was approximately one and a half years old at the time of the crash. Trial Tr. at 1204-05. At the time of the crash, the truck was towing a trailer. *Id.* The truck had mismatched tires from three different brands and mismatched wheels. *Id.* at 1205. Some tires were older than then vehicle, and the spare wheel was from 2007. *Id.* The vehicle had an auxiliary spring which reduces the sag or

5

droop at the back of the vehicle from heavy loads, but the spring does not increase the load rating of the vehicle. *Id.*

22. The subject tire is a road-highway tire and is primarily designed for use on the asphalt and highway. *Id.* at 1548. Defendant understands the tire may occasionally be used off asphalt, such as on graded gravel roads or parked on lawns. *Id.* The tire model was sold to car manufacturers as original equipment, and to replacement markets. *Id.* at 1486.

23. Defendant's manufacturing specification for the subject tire is identified by the root article No. 0450184. These specifications identify the components that make up the tire assembly and the dimensions of those components. *Id.* at 1505:24-1506:4; Exhibits 1060-79.

24. Defendant began making tires pursuant to root article No. 0450184 in the 37th week of 2012. *Id.* at 1483:17-1485:1, 1499:10-16. Between the 37th week of 2012 and September 2018, Defendant produced ███████ tires made to the specification with the root article No. 0450184. (the "subject tire population"). *Id.* at 1499:21-1500:13, Ex. 1038. There was insufficient evidence in the record to show that other tires were similar in design or manufacture to the subject tire made pursuant to specification No. 0450184. *See, e.g., Id.* at 173:12-178:17, 179:3-184:15, 184:21-191:22, 1500:14-1503:6, Ex. 1249.

25. The exact manufacturing date of the tire at issue could not be determined due to the destruction of the tire's DOT serial number. *Id.* at 1483:13-16, 1485:19- 1486:18. Tires must be submitted to Ford within 52 weeks of manufacture. Radtke Deposition testimony at 19. However, Defendant aims to manufacture tires within 10 to 30 days of manufacture. *Id.*

26. The subject tire was rated at a 3,195 pound max load carrying capacity. Doc. 725, Trial Tr. at 1501-02. It had a max speed rating of 112 MPH. *Id.*

**C.** **The subject tire was not defective, and a defect did not cause the tread-belt separation.**

27. A tread belt separation may be caused by a manufacturing or design defect. Tread belt separations can also be caused by cuts, punctures, impacts, underinflation, overloading, or high speeds. Trial. Tr. at 226:1-12; 1478:25-1479:2; 1864. Therefore, the mere occurrence of a tread-belt separation does not prove a defect. *Id.* Rather, Plaintiffs have attempted to identify the alleged defect which caused the tread-belt separation.

28. The Court finds that there was no manufacturing or design defect in the subject tire, and no defect caused the tire disablement or tread belt separation. As explained more fully below, the Court finds that:

- The inner liner was not defectively designed or manufactured. The inner liner was sufficiently thick. The inner liner was properly measured during manufacture.

- There was no adhesion defect; and

- The overlap splice was properly made and not defective.

29. Although the Court admitted Mr. Carlson's expert testimony, upon hearing his testimony and the entire case, the Court did not find his testimony persuasive.[3] Some of his opinions were unsupported by testing or peer-reviewed literature[4], while other opinions were not persuasive.

---

[3] The Court took under advisement certain objections to Mr. Carlson's testimony. Tr. Trans at 130:16-18; 145:7-9. Defendant asserted that Mr. Carlson's trial testimony was different from his deposition testimony. The Court overrules the objection. The Court will allow the testimony and will consider any objection in evaluating the weight of the testimony.

[4] Although reliance on peer-reviewed literature is not required to admit an expert opinion, the Court may consider the sources on which an expert relies for its persuasive value. *See Att'y Gen. of Oklahoma v. Tyson Foods, Inc.*, 565 F.3d 769, 780 (10th Cir. 2009) (court may weigh persuasive value of expert opinion).

30. Defendant offered the expert testimony of Mr. Grant, a tire forensic analyst who opined in part on tire failure analysis. *See* Doc. 726 at 1676:13-15. The Court found Mr. Grant's testimony highly credible and persuasive. Mr. Grant graduated from college in 1971 with a degree in engineering, and had extensive experience working at tire companies in various positions highly relevant to tire failure analysis. *Id.* at p. 1677-80. His positions involved testing tires and testing them for failure. *Id.* at p. 1681. He worked in tire design and manufacturing for 34 years. *Id.* at 1683. Mr. Grant retired from Defendant in 2005, and since then worked as a tire failure analysis. *Id.* at 1683:3-14. Considering his testimony and the evidence overall, the Court did not find that his prior relationship Defendant to negatively impact his credibility and persuasiveness. In considering the expert opinions and the totality of the circumstances, the Court found Mr. Grant's testimony more persuasive than Plaintiffs' experts.

31. Mr. Carlson opined that a perfect storm of four defects caused the tire to come apart. *Id.* at 276. The Court finds that Plaintiffs have not shown any defective condition in the tire.

32. The remains of the subject tire are extremely limited. The top five layers of the tire were virtually gone. *Id.* at 237. Only 5% of the original tread was found. *Id.* The nylon cap plies are missing. *Id.* 70 percent of the bottom belt is missing. *Id.*

33. The inner liner was adequately designed and manufactured. A breach of the inner liner can cause intracarcass pressurization and could potentially affect the durability of the tire and force the components of a tire apart. *Id.* at 1816. It can also cause oxidation degradation. *Id.* at 1817. Oxidative degradation is the degradation of the rubber to rubber and rubber to steel adhesion. *Id.* at 1817.

34. The inner liner is specified to be ████ thick. ██████████████ ████████████████████████████████ *Id.* at 1505; *see also* Exhibit

1190 at 32.  Mr. Carlson asserted that the inner liner was defective because it was insufficiently designed at ▮▮▮▮▮ thick, and was measured incorrectly. The Court disagrees. The Court finds that the inner liner was sufficiently thick, properly measured, and was not defective. Trial Tr. at 1726:8-16 (Grant testimony).

35.  The subject tire population had the same specified green gauge or thickness for the inner liner components, which consisted of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮. *Id.* at 1505:25-1508:23. The cured tire dimensions for the subject tire and certain internal components are identified in specification 0450184. *Id.* at 1503:7-12. All of the tires in the subject tire population had the same specified dimension for the ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* at 1508:24-1509:5.

36. Measurements of the failed subject tire show that the tire well exceeded Defendant's specification for ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* at 269:6-270:9; 1503:7-1505:24, 1726:20-1731:12, 1777:22-1778:3, Ex. 1055, Ex. 1190 at 32, Ex. 1272 at 1, 9, 11.  Mr. Grant took multiple measurements of the inner liner.[5]  The parties disputed where the measurement should begin and end. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ *Id.* at 268. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The Court finds that Defendant's measurement process was reasonable, and consistent with the tire manufacturing industry. *Id.* at 1777:9-21.  This methodology makes sense and is industry standard, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.*; Hildebrand Depo., Oct. 9, 2019, at 193:18-22

37. The designed thickness or gauge of the inner line was consistent with or exceeded that of other light truck tires in the market.  Trial Tr. at 1774:4-1776:1.

---

[5] When the Court refers to "inner liner" here, for ease of reference, it refers not just to the halobutyl layers, but the layers of rubber below the body ply cords.

38. Oxidative degradation, which can be caused by an inner liner that is too thin, was not found in the tire.  *Id.* at 265:8-267:9

39. Plaintiffs' expert, Mr. Carlson, attempted to measure solely the halobutyl layer of the material below the body ply cords.  The primary layer of the inner liner is made up of halobutyl, which resists air permeation.  *Id.* at 1728:19-25. This layer helps to keep a tire inflated, and it helps to prevent oxygen from seeping into the structure of the tire. *Id.* at 116:8-20. The Court finds the material below the cord was generally well over ███████ in depth. *Id.* 1728-30; Exhibit 1272 at p. 1-9, 11; 1545. ████████████████████████████████████████████████████

███████████████████████████████████████ *Id.* at 1545. ██████████████████

█████████████████████████████ The Court finds that it is appropriate ████████

████████████. Mr. Carlson performed measurements of what he asserts was just the halobutyl layer, and his three measurements came out to .46, .5, and .6 inches. ████████████

████████████████████████████████████████████████████████

███████████████████ *Id.*  at 269. For example, his .046 measurement would have been .08 inches. *Id.* at 270.

40. There was also no cord-shadowing in the tire.  Cord-shadowing occurs when certain polyester cords in the tire can be seen through a thin inner liner.  In this tire, the inner liner was thick and there was no cord shadowing. *Id.* at 1747:2-21. This further suggests that the inner liner had an adequate thickness. *Id.* at 1748:5-8; Exhibit 1270 at p. 57, 67.

41. The Court finds the record insufficient to establish that ████████ was insufficient to prevent air permeation. The Court also finds that the inner liner was within industry standard for that type of tire.  Doc. 726, Trial Tr. at 1731:1-12l; 251-52 (inner liner gauge within average of

inner liners for light truck tires). The Court finds that there was no design or manufacturing defect as to the thickness or gauge of the inner liner.

42. Moreover, the Court finds that the inner liner splice was not defective. *Id.* at 1743:10-12. Every component of a tire is made with a splice – where the two ends of the layer meet. *Id.* at 1732:7-20. One type of splice is an open splice, where the ends of the components are brought up next to each other. *Id.* at 1732:22-24. Another is an overlap splice, where one end of the material wraps over the other. *Id.* at 1732:24 to 1733:1-2.

43. A poor building splice technique or foreign materials may cause an opening of the inner liner splice. *Id.* at 1830; Exhibit 49u at 132. The Court finds the overlap splice was well-made and there was insufficient evidence of foreign materials.

44. The splice overlap design specification for the tire in its green state, before it is cured, is ███████████████████████. *Id.* at 1591; 1622. Mr. Carlson agreed this design specification is adequate. *Id.* at 278.

45. Plaintiffs assert that the splice in this tire was improperly made or manufactured. The Court has viewed the splice and disagrees, and finds that Defendant used a proper overlap splice in the subject tire, and did not use an open splice. *Id.* at 1733:12-14. The overlap splice was properly made. Defendant manufactures its tires with an overlap splice of the inner liner, which is made by an automated process which to the tire-building specification. *Id.* at 1573:17-1574:25; 1590:15-1592:23, Exhibit 1033, Exhibit 1192 at 6; Exhibit 1578. An operator watches the process. *Id.* An inspection of the overlap splice is performed by the operator at the tire-building machine. *Id.* at 1607.

46. The splice was sound and uniformly overlapped. *Id.* at 1733:11-15; 1741:17-21. The crack visible near is a cosmetic crack which was not a defect and did not impact the inner line's

efficacy. *Id.*  No polyester cords are visible under the splice. Any damage around the inner liner splice was more likely than not caused by the accident, and not a manufacturing or design defect. *Id.* at 1737:1-8; 1738:1-17. Even assuming the inner liner splice was defective, the Court notes that Mr. Carlson admitted it did not cause the tread-belt separation.  *Id.* at 275-76.  Therefore, the overlap splice was adequately made, and there was no manufacturing or design defect.

47. To the extent there was a crack in the inner liner material, it is not evidence of a manufacturing defect and can be caused by improper inflation pressure, tire abuse, underinflation and excessive load.  *Id.* at 283:14-285:3, 294:17-295:5, 1778:9-1783:3.  The Court finds that there is no evidence of a manufacturing defect, but as explained below, the crack was more likely than not caused by one of these factors.

48. The Court finds there was no lack of adhesion between the layers caused by a manufacturing or design defect.  Contamination from water, oil, or dirt can cause a lack of adhesion between layers.  *Id.* at 77:10-11.  Mr. Carlson also asserts that overaged materials can cause an adhesion defect.  The evidence did not suggest contamination during the manufacturing process. *Id.* at 1749:19-25; 1750:1-5.  Moreover, overaged stock was not used. *Id.* at 1750:3-5. Mr. Carlson agreed that he did not find evidence of an improper curing process.  *Id.* at 344.  Mr. Carlson did not see evidence of a void, where air gets trapped between layers during the curing process.  *Id.* at 345.  There was evidence of multi-level tearing, indicating that layers were not separating. *Id.* at 1787-88. This suggests there was no loss of adhesion between layers. *Id.* at 1788-89.

49. Moreover, the Court finds there was insufficient evidence of oxidative degradation of the tire, and oxidative degradation did not contribute to the failure of the tire.  *Id*. at 1743:21 to 1744:1-10.  Mr. Carlson admitted that he did not find evidence of oxidative degradation.  *Id.* at

266.  The adhesion of the components of the tire did not breakdown due to excessive oxygen degradation. *Id.* at 1745:25 to 1746:10.

50. The Court did not find sufficient evidence to prove the use of overaged stock.  *Id.* at 346.  The plant has a system for ensuring that overaged stock is not used.  *Id.* at 347; 1593-95.  Defendant's manufacturing procedures specify age limits for the different green components that go into a tire assembly.  *Id.* at 1593:3-1595:10, Exhibit 1191 at 5.  The Mt. Vernon plant utilized a system of barcodes and scanners for component traceability of materials in the manufacturing process.  ████████████████████████████████████████████████████████████████ ████████████████████████████████████████  *Id.* at 1586:23-1588:8, 1593:3-1595:10, Exhibit 1191 at 5.

51. Polishing between inner layers of a tire can be a sign of separation between the layers of the tire.  However, the presence of any type of polishing does not necessarily indicate an adhesion defect.  Here, the light polishing on the belt edges was consistent with over-deflected operation, as explained below.  Trial Tr. at 1803-05.

52. The presence of a liner pattern or process marks is not evidence of an adhesion problem in a tire.  *Id.* at 1783; 356-58. A knit line is not an indication of a loss of adhesion between layers of the tire. *Id.* at 1784. Mr. Carlson admitted he has not conducted testing or a study on this theory that pattern or knit lines are proof of an adhesion defect. *Id.* at 353-54, 358.  Nevertheless, the subject tire did not have liner pattern marks. *Id.* at 1783-84; *Id.* at 1814. In sum, liner pattern marks and knit lines are not evidence of any defective condition in this tire.  *Id.* at 1785. Rather, there was multilevel tearing in the separates surfaces which demonstrated good adhesion in the tire.  *Id.* at 1783:9-1784:2, 1786:3-1789:3, Exhibit 49b.

53. The Court finds there is insufficient evidence in the record to conclude that contamination caused an adhesion defect leading to the tread-belt detachment.  Trial Tr. at 344:21-345:15, 1749:19-1750:2.  The tire at issue was not exposed to any of the conditions in the Mt. Vernon plant that let to Defendant's recall of certain 33x12.50R18 LT General Grabber tires.  *Id.* at 1596:16-1598:8, Exhibit 1019.  Mr. Carlson speculated that contamination could have caused the belt detachment, but admitted that he could not identify whether there was contamination in the subject tire. *Id.*  at 190:18-22.

54. Tires from a separate tire line with different specifications were recalled due to oil contamination.  Exhibit 17b.  Although the recalled tires were made on the Mt. Vernon plant, they were not made on the same machines or even in the same building. The contamination was isolated to 64 flotation tires made and stored in Plant 4.  *Id.* at 1596-98. Those materials had been placed in overflow storage, which was outside of normal processes.  *Id.* at 1617.  The subject tire was produced in a different building, Plant 1. Moreover, the belt materials for the subject tire were stored in Plant 1.  *Id.* at 1596-98.  The belt materials used to make the recalled tire were stored in Plant 4, where the oil contamination occurred.  The subject tire was made in Plant 1, and the material used to make the subject tire would not have been stored in the building where the contamination occurred.  *Id.* at 1617-18.  There is insufficient evidence in the record to suggest that contamination also occurred in Plant 1.

55. The Court declines to infer that the subject tire was also contaminated, and finds any assertion of contamination is merely speculative.  The Court finds there is insufficient evidence in the record to suggest that because tires made and stored in a different building may have suffered contamination, this subject tire must have also suffered contamination.

56. Therefore, the Court finds that Plaintiffs have not shown that the subject tire suffered from a manufacturing or design defect.

**D.    Warranty adjustment data has little to no probative value in determining whether the subject tire suffered from a defect.**

57. Plaintiffs suggest that warranty adjustments for other tires may indicate a defect in the subject tire.  The Court disagrees.  The Court finds that warranty adjustments are generally not persuasive evidence in this case of whether there was a tread-belt separation in this tire due to a manufacturing or design defect.  The Court also finds there is little probative value to warranty adjustment data for other tires.  Nevertheless, Plaintiffs appear to attempt to use adjustment data to show systemic issues at the Mt. Vernon plant or the subject tire line.  The adjustment data also generally does not comment on the cause of the adjustable condition.  The Court finds that the adjustment data, along with the testing data, do not suggest there were systemic issues with the tire line or the Mt. Vernon plant.  Rather, such data suggests that the subject tire line performed well.

58. A warranty adjustment is a customer satisfaction program and an adjustment does not mean there was a problem with a tire, or indicate the cause of that problem.  *Id.* at 1526; 1543-44.  If a tire is adjusted under the warranty, it does not mean the tire has a defect.  *Id.* at 1521.

59. When a tire comes in as a warranty return, a technician looks at the tire and confirms that it is a warrantable category of condition.  *Id.* at 1521.  The technician notes a condition code, the manufacturing year from the DOT number, and the day of return.  *Id.* at 1521.

60. For the subject tire population of ▇▇▇▇▇ tires made between September 2012 through September 2018, there were ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.  *Id.* at 1502:22-1523:3, Ex. 1039; Dep. of Harold Morgenstern, December 6, 2019, at 82:19-83:10, 89:16-94:4;

94:10-11.  

███████████████████████████████████████████

████████████   *Id.* at 1522.  ████████████████████████████████

██████████████   *Id.* at 1522.   The cause of the tread-belt separation of those tires is not in

the record. The Court finds this evidence insufficient to suggest that the tread-belt separation in

this tire was caused by a manufacturing or design defect. Plaintiffs suggest that returns for

uniformity of ride indicate tread-belt separation.   But many tires are returned or adjusted for

uniformity of ride and have no tread-belt separation. *Id.* at 1863:1-16.

61. For the subject tire population, there were ████████████████████████████

██████████████████.  *Id.* at 1523; 256.    Mr. Carlson admitted that this data could be

"significant" as to design defects. *Id.* at 257.

62. The Court find that adjustment data is not a good indication of the existence of

manufacturing or design defects in a tire.  Its probative value at trial is very low.  It is not probative

evidence of a defect.  Even if the Court considered the data as evidence of defects, the adjustment

data on this tire is very good. *Id.* at 1858:13-15.

**E.      Defendant's procedures, processes, and testing were proper**.

63. Plaintiffs assert that the Defendant's procedures, processes, testing, or inspections were

inadequate, allowing a defective tire to enter the market.  The Court disagrees, and finds that the

record does not reflect that Defendant failed to adequately inspect the tires or that Defendant's

procedures were inadequate.

64. The testing and field performance of the subject tire population was inconsistent with

any suggestion of a design or manufacturing defect. *Id.* at 258:20-259:1, 1776:2-1776:9.

65. The subject tire went through a rigorous design and testing process, and met or exceeded all of Defendant's internal design standards as well as Ford's design standards and qualification tests. *Id.* at 259:22-263:5, 1509:14-1517:15, Ex. 1111 at 35, 54; Ex. 1126.

66. █████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████████ Trial Tr. at 1517:16-1520:11, Exs. 1118, 1120-1173. Ongoing surveillance testing also confirmed the subject tire's design passed the testing requirements imposed by the Federal Motor Vehicle Safety standards. *Id.*

67. The subject tire line went through Ford's tire-aging durability test. That test measures the durability performance of artificially aged tires. It simulates the aging of six-year-old tires in Arizona-like climate. Trial Tr. at 1512. ████████████████████████████████

████████████████████████████████████ *Id.* ██████████████████████ *Id.* at 1513.

68. ████████████████████████████████████████████████████████

████████████████████████████ Through this test, a representative tire from the subject tire line passed the test and kept its structure. *Id.* at 1514. █████████████████████

█████████████████████████████████████████ The test runs the tire underinflated, overloaded, and aged to simulate the tire being in Arizona for six years. *Id.* at 1515. Ford approved the tire's performance.

69. Defendant also conducts its own tests. Defendant conducted a light truck endurance test ("LTEND"). *See* Exhibit 1126; Trial Tr. at 1515. ████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████ *Id.* at 1516. ████████████

████████████████████ *Id*. at 1516-17.  Every tire from this subject line did well.  *Id.* at 1517.
Defendant does continual testing of the subject tire line, in which they pull tires from the
warehouse and test them.  *See* Docs. 1120-1173 (surveillance testing); Exhibit 1118 (summary of
testing).

70. They also performed a light truck high speed test ("LTHIS").  This test observes how
the tire handles high-speed stress. ████████████████████████████████████

████  Trial Tr. at 1520.  The tested tires were pulled from regular production.  *Id*

71. Plaintiffs suggest that the Mt. Vernon plant had systemic manufacturing issues.  The
Court disagrees. The Court finds that Plaintiffs have not shown that the Mt. Vernon plant has
chronic or systemic issues leading to the alleged defects in the tire.  Even if the Court assumed the
Mt. Vernon plant did have systemic issues, Plaintiffs did not link any of those alleged issues to the
subject tire, or show how those alleged issues caused defects in the tire.

72. The subject tire was produced at the Mt. Vernon facility, which in the 2014 time period
produced more than 10 million tires per year.  Dep. of Mark Spence, October 10, 2019, at 123:5-
10, 143:20-144:3.  The record does not reflect any other injuries allegedly resulting from Mt.
Vernon made tires.

73. During the time period the subject tire was manufactured, Defendant's Mt. Vernon
plant employed a quality system that consisted of continuous monitoring of every aspect of
manufacturing process from receipt of raw materials through to the final inspection of finished
tires.  Trial Tr. at 1565:15-1573:16, 1579:25-1582:9, 1583:22-1588:8, Exhibit 1108 at 2, 11, 34.

74. After a tire is cured, a tire is sent to inspection or "final finish". *Id.* at 1579.  The first stage is a visual and tactile inspection.  *Id.* at 1580. Inspectors will perform a "100 percent" visual and tactile inspection of a tire.  *Id.* Inspectors go through a training program, and ███████████ ██████████████████████████████████████████████████.  *Id.* at 1580-81.  Inspectors are given an off-standard catalog of anomalies, and they can identify matters to be sent to over-inspection.  *Id.* at 1581.  Over-inspection is an audit function who pull product to judge the effectiveness of inspectors.  *Id.*  Inspectors generally have ████████ to inspect a tire. *Id.* at 1614.

75. Defendant has in place a manufacturing process control plan, which is a system of checks to verify that products are correct or processes are running correctly. Trial Tr. at 1583-84; Exhibit 1108 at 2, 11, 34. ██████████████████████████████████████████████ ███████████████████████ Trial Tr. at 1586.

76. If a tire fails inspection, it is rejected and sent to the classify inspector, who scraps the tire.  *Id.* The Mt. Vernon plant receives yearly third-party and second-party certifications.  *Id.* at 1583.

77. As part of its production part approval process with Ford, less than one part per million may vary outside of tolerance limits.  *Id.* at 1590.

78. The Court finds that the record does not suggest that Defendant's pay for performance plan caused or contributed to the alleged defects in the subject tire.

**F.      The work-truck was not properly maintained or operated and its condition and manner of operation caused or contributed to the tread-belt separation.**

79. Mr. Glennon's expert testimony on the standard for motor carriers and commercial motor vehicle operators was admitted without objection.  Trial Tr. at 1329.  The Court found his testimony persuasive and credible.

80. Trac-Work was registered as a motor carrier.  *Id.* at 1339. The gross vehicle weight rating for the F-350 was 10,000 pounds, and the attached trailer had a weight rating of 14,000 pounds, for a combined vehicle weight rating of 24,000 pounds.  A commercial motor vehicle is a vehicle with a gross vehicle weight rating over 10,000 pounds, or a combination vehicle with a combined gross vehicle weight rating over 10,000 pounds. Therefore, the subject truck at the time of the accident was a commercial motor vehicle under Federal Motor Carrier Safety Regulation (FMCSR) 390.5.  *Id.* at 1331-32; 49 CFR § 390.5 (A vehicle is a commercial motor vehicle when it "[h]as a gross vehicle weight rating or gross combination weight rating, or gross vehicle weight or gross combination weight, of 4,536 kg (10,001 pounds) or more, whichever is greater"). Trac-Work was required to follow the Federal Motor Carriers Safety Regulations. *Id.* at 1330. Commercial motor vehicles are often larger, used more, and subject to harsh operating environments, resulting in increased risk of injury and death.  *Id.* at 1332:10-1333:6.

81. Trac-Work had notice that the work truck and trailer combination was a commercial motor vehicle subject to the requirements of the FMCSRs by virtue of a citation issued to Mr. Martinez and Trac-Work.  On November 19, 2014, Mr. Martinez was stopped by a Texas commercial Vehicle enforcement officer while he was driving a Trac-Work F-350 work truck and pulling a trailer.  During that stop, Mr. Martinez and Trac-Work were cited for 16 violations of the FMCSRs which included: failure to display a DOT number, no log book record of duty status, no medical certificate for the driver, no evidence of periodic maintenance inspection of the truck or trailer, and improperly installed safety chains.

20

82. None of the trailer's four brakes were functioning before the accident, and the brakes had likely been disabled for an extended period of time. *Id.* at 1243.  The use of the trailer with non-functioning brakes was contrary to Ford's recommendation. *Id.* at 467:18-468:15, 1243:3-1244:9.  Mr. Martinez did not inspect the brakes to see if they were working. *Id.* at 665:18-666:12.

83. The 16-foot utility trailer weighed approximately 3,105 pounds unloaded. *Id.* at 434:17-435:3. Trac-Work corporate policies indicated that a typical load to be carried by the trailer would weigh approximately 7,348 pounds bringing the total to 10,453 additional pounds that the brakes on the work truck had to slow down and bring to a stop in addition to the weight of the truck itself.  Exhibit 1231 at 5.

84. The loaded weight of the trailer may have been higher than stated in the Trac-work policies.  Mr. Martinez noted his method for loading the truck and trailer was to eyeball whether the fenders were too close to the wheels.  Trial Tr. at 655:3-656:14. This method of loading the truck and trailer leads to overloading, and there was evidence of historic overloading of the trailer in the form of frame and brake-line contact with the axle of the trailer. *Id.* at 1397:1-8.  As noted above, the truck had been modified to reduce sag, but this modification did not increase the vehicle or tire weight rating.

85. The non-functioning brakes on the 16-foot trailer contributed to the excessive heat observed in the tire at issue. *Id.* at 1240:9-1241:22, 1355:17-1357:16.  Mr. Martinez testified that the trailer was pulled by the work truck to approximately half of the job sites they went to. *Id.* at 626:18-627:1. Because the trailer brakes were inoperable, the brakes on the work truck had to provide all braking power. This caused the work truck brakes to generate excessive heat which was then imparted through the steel wheel to the lower sidewall of the subject tire.  This heat

resulted in melted polyester cords in the bead region and the separation. *Id.* at 1356:10-135823, 1714:11-1725:12, Exhibit 1279 at 16, 17, Exhibit 1273 at 1.

86. Mr. Glennon opined that Trac-Work did not meet the standard as a motor carrier in this case, which upon reviewing the totality of the admitted evidence in this case, the Court finds persuasive. *Id.* at 1333. The subject vehicle was cited by a Texas law enforcement agency for stop lamps being inoperable; driver not having a record of duty status, which is hours of service or logbook, and the driver was cited for not having a medical certificate. Moreover, they were cited for failing to display a US DOT number on the truck. *Id.* at 1342-43.

87. Trac-Work had a written policy that the driver was supposed to inspect the truck daily and report problems immediately. *Id.* at 1348. A supervisory inspection was to be conducted once a week. *Id.* That inspection was to determine whether the vehicle met the manufacturer's standards. *Id.*

88. Mr. Martinez or Mr. Munn completed inspection forms for the tire. The Court finds that the inspection forms carry little probative value, and were likely not properly filled out, as the inspection forms were inconsistent with the condition of the vehicle. *Compare* Ex. 1523, 1524 (inspection forms) with Glennon Testimony, Trial Tr., at 1353-54. The trailer had a bald tire. Its safety chains were broken and had been dragging on the ground. The lights on the trailer were inoperable. The brakes on the trailer were inoperable. The lights on the trailer were inoperable. The tire pressure monitoring light was on in the truck, but the inspection report did not indicate that. Ex. 1523, 1524 (inspection reports). These inspection reports did not genuinely reflect the condition of the vehicle. Trial Tr. at 1353.

89. The service records for the work truck confirm that the brakes were abused and creating excess heat. *Id.* at 1355:17-1359:2. Approximately one month before the accident, the brakes were

replaced at approximately 46,000 miles, which is an early replacement. *Id.* at 1357. The brakes are designed to last 150,000 miles. *Id.* at 1358. The front pads, rotors, and calipers were replaced. All four brake rotors were glazed. *Id.* at 1356. Glazing can be caused by high heat from overloading the truck. *Id.* at 1356. The glazing on the brakes was caused by the truck being overloaded and from hauling trailer with non-functioning brakes while carrying heavy loads. *Id.* at 1355:17-1359:2.

90. Trac-Work had the rear suspension of the truck modified by adding an additional leaf spring that did not increase the load carrying capacity of the truck but would have reduced the amount of sag in the rear of the truck when heavily loaded. *Id.* at 1229:19-1230:11, 1334:19-1335:14. As explained previously, Mr. Martinez judged whether the truck was overloaded by how much the back of the truck sagged.

91. The parties presented conflicting evidence of what was loaded in the subject truck, and whether the truck, along with the items in the truck and the lip of trailer, exceeded the gross vehicle weight for the vehicle. The truck was near capacity when unloaded, and would have exceeded capacity when loaded. *Id.* at 1409. There were no weighing records for the truck, or evidence that they weighed the truck to insure it did not exceed its weight capacity. *Id.* The Court finds the best evidence of whether the tires were overdeflected were the tires themselves. And the physical condition of the tires suggested they were overdeflected- either underinflated or overloaded.

92. Trac-Work did not have a policy in place to weigh vehicles to ensure that it did not exceed the gross vehicle or trailer weight rating. Dep. of Robert Favors, 87:6-22. Trac-Work did not weigh the vehicle or confirm that a truck was not overloaded. *Id.* at 193:22 - 194:1; 1390:1-13; Dep. of Robert Favors 86:3-88:16. Trac-Work should have weighed the work truck and kept

records regarding what the work truck was carrying while in service, and their failure to do so fell below the minimum standard of care.  Trial Tr. at 1409:8-1410:3.

93. The tire pressure monitoring system was not functioning because the subject tire was mounted on the original spare wheel which lacked a sensor. Therefore, the entire tire pressure monitoring system on the truck was disabled.  *Id.* at 1213:23-1214:9, 1219:2-1220:22, 1225:19-24.  The lack of a functioning tire pressure monitoring system fell below the minimum standard of care.  *Id.*  at 1359:18-1360:1. Mr. Martinez and Trac-Work knew or should have known the tire pressure monitoring system was not working. The dash warning light for the tire pressure monitoring system would have been illuminated. *Id.* at 1213:23-1214:9, 1219:2-1220:22, 1225:19-24.  Nevertheless, Mr. Martinez and Mr. Munn routinely filled out inspection paperwork incorrectly stating that no warning light was illuminated.  *Id.* at 1351:18-1354:6; Exhibits 1523, 1524.  Trac-Work agrees that the truck should not have been operated with an illuminated tire pressure monitoring light. Dep. of Robert Favors, 50:13-53:3.

94. Although the truck was only eighteen months old, at the time of the accident it had several mismatched tires and wheels. Trac-Work failed to adequately document the repairs and maintenance of the truck as required for a motor carrier.  *Id.* at 1344:17-1348:9, 1354:17-1355:5. Trac-Work trucks were driven off road and tires often sustained damage. *Id.* at 627:19-628:3, 755:3-14, 756:1-5.

95. The other, companion tires on the truck were as follows:

a. the left front tire was a General Grabber HTS, Size LT245/75R17 manufactured the 24th week of 2014.  Stipulated Fact 10.

b.  The right front tire was a Firestone Transforce HT, manufactured the 4th week of 2014. Trial Tr. at 1755:9-19;

c.  the right rear tire was a BF Goodrich Rugged Trial T.A., manufactured the 43rd week of 2013.  *Id.* at 1758:6-14; and

d. the spare tire was a Firestone Transforce HT, size LT265/70R17, manufactured the 14th week of 2011.  *Id.* at 1764:18-25, 1765:8-16.

96. These tire tires were also abused and/or used in extreme service conditions, and showed evidence of over-deflected operation and excess heat.  *Id.* at 1750:10-1773:20, Exhibit 1275 at 18, 26, 28, 29, Exhibit 1276 at 22, 44, 45, 47, Exhibit 1277 at 19, 35; Exhibit 1278 at 11; Trial Tr. at 1204:12-1205:18; 1207:16-1208:3, 1210:8-22, 1334:2-1336:20, 1356:5-1357:16, 1397:1-8.

a.  the left front and right rear tires had rim line compression grooves and polishing around their beads where it made contact with the rim flange, showing that they were exposed to extended periods of over-deflected operation.  *Id.* at 1750:21-1753:12, 1761:11-1762:25, Exhibit 1275 at 19, Exhibit 1277 at 19.

b.  the left front and right rear tires both showed evidence of off-road use; *Id.* at 1753:18-1754:18, exhibit 1275 at 19, 26, 28, 29;

c.  There were pre-existing bends in the right front wheel and spare wheel from prior impacts.  *Id.* at 1755:25-1758:5, 1767:4-1768:2, Exhibit 1276 at 44, 45, and 47; Exhibit 1278 at 11.

d.  the right rear tire, a BF Goodrich tire, had fast wear, a localized are of tread that is worn down more than the surrounding tread, evidencing an internal separation between components.  *Id.* at 338:20-339:22, 341:7-11, 1759:12-1761:10, Exhibit 1277 at 35, Exhibit 1570.

97. On the day of the crash, the work truck and trailer would have failed inspection and should have been taken out of service.  *Id.* at 1350:2-1351:17, 1398:9-1399:7.  Trac-Work's policy was to ensure the truck and its components were kept within the manufacturer's specifications.

However, the evidence did not show that Trac-Work enforced its policies or adequately oversaw maintenance and repair of the truck and trailer.  *Id.* at 1348:12-1352:10, Ex. 1231.

98. Trac-Work was not performing adequate periodic inspections and fell below the minimum standard.  Had Trac-Work been performing periodic maintenance inspections they would have discovered the truck's issues prior to the accident. *Id.* at 1358:8-1359:2.

99. The left front tire was the same kind of tire as the subject tire.  *Id.* at 1751:1-3. Like the subject tire, it showed uneven wear on the shoulder grooves. *Id.* at 1752:6-11. This is consistent with overdeflection. *Id.* at 1752:12-14. There was also rim-compression grooving in the tire, *Id.* at 1752:16-18, and worn polished flanges, consistent with overdeflection.  *Id.* at 1753:1-5.  The other rear tire was a BF Goodrich tire, and it also showed evidence of wear on a shoulder, evidence of overdeflection *Id.* at 1758:17-21. The BF Goodrich tire showed evidence of an internal separation between steel belts that was developing.  *Id.* at 1760-1761.  This tire showed evidence of overdeflection, including rim-line compression grooves and polishing.  *Id.* at 1761.  As noted above, overdeflection can be a cause of separations between the layers in a tire.

100. The Court finds the truck was overloaded, based in part on the overdeflection of the tires, described above, along with the glazing of the brakes.  The parties presented conflicting and unclear evidence of what was loaded into the truck and trailer, and the total gross weight.  The Court find the best evidence is (1) the condition of the tires, and (2) the condition of the brakes, which the Court finds both suggest that the truck combined with the tires was overloaded. Trial Tr. at 1357.

101. Mr. Martinez was not trained in the safe operation of a commercial motor vehicle.  *Id.* at 1364-65.  Drivers are limited to working 70 hours in an eight-day period.  *Id.* at 1365-66. There is no driver log for the vehicle recording whether Mr. Martinez worked – including driving – more

than 70 hours per week. *Id.* However, there was a log of how many hours he worked excluding driving time for the return trip. *Id.* at 1368. The day of the crash was Mr. Martinez's eighth consecutive day of work. The previous seven days he worked 75.5 hours. Therefore, on the day of the crash, Mr. Martinez was not eligible to drive the vehicle under the Federal Motor Carrier Act. *Id.* at 1365:13-1366:20, 1367:3-12. There is a higher probability an accident will occur when a driver is working excessive hours. *Id.*

102. The driver was required to conduct the inspections, but he delegated inspections to laborers on this crew, including Mr. Munn.

103. It is clear from all the evidence that the tires were heavily abused, in "rugged" application, and overdeflected. *Id.* at 1770. Moreover, the tires were not properly maintained. *Id.* The tires were used at excessive speeds given the weight they were carrying. *Id.* at 1771. The trailer did not have operating brakes, and the truck had glazed brake rotors. *Id.* at 1771. That suggests that the brakes were overheating, and that heat transferred to the tires. *Id.* The bead pullout on the tire, along with the melted polyester cords, indicated that the tire was getting excessively hot from the brakes. *Id.* The tires were used in off-road conditions, and displayed cutting and chipping. Doc. 726 at 1753:3-18. A different tire was installed on a bent rim. *Id.* at 1758:3-4.

104. Because Trac-Work did not pay its employees for the return trip from a job site, Mr. Martinez was incentivized to ignore Trac-Work's policies regarding speed limits.

105. Moreover, Trac-Work failed to adequately train employees to operate and maintain the vehicle. There was apparently no training on the safe operation and maintenance of the vehicles. *Id.* at 582:1-13, 1332:10-1383:12, 1364:15-1365:7, Exhibit 1238, Dep. of Robert Favors, 31:15-21, 32:3-33:7, 128:14-132:3. Trac-Work's policy was to require employees to obey the

speed limit.  Dep. of Robert Favors at 135; Exhibit 1238.  Mr. Martinez violated Trac-Work's policies by driving 93 MPH in a 70 MPH zone.  *Id.* at 660:11-25, 470:14-23; Exhibit 1238; Dep. of Robert Favors 74:15-77:8, 144:10-12, 144:14-17, 144:19-22, 145:15-20.

106. According to Trac-Work policy, the driver – the foreman, in this case Mr. Martinez, was required to conduct a precheck walk around for obvious defects.  Dep. of Robert Favors, at 119:4-8. No one at Trac-Work checked to make sure Mr. Martinez was the one conducting the pre-trip inspections.  *Id.* at 122:3-6.

107. Trac-Work's Employees are paid for the time they drive to a job site, but are not paid on the drive back.  The driver is not paid during the drive.  Dep. of Robert Favors at 29:1-5; 11-16. This policy in effect incentivizes a driver to speed.

**G.    The tire more likely than not failed due to abuse or other factors unrelated to any alleged manufacturing or design defect.**

108. The Court finds that the tread-belt separation more likely than not occurred due to factors other than manufacturing or design defects.  A tire separation can occur for many reasons, including road hazards such as punctures or impacts, underinflation, overload, high speed, or high temperatures. *Id.* at 1479.

109. The tread-belt more likely than not separated for the following reasons.  The tire had a chronic history of over-deflected operation; there was excessive heat, caused by overheating brakes, in the bead area of the tire, and the excessive speed of the truck and trailer, in light of the overall load of the truck and trailer and condition of the tires. *Id.* at 1725:20 – 1726:1.

110. The tire was subjected to a rugged application and suffered abuse.  The work truck was routinely driven off road and tires often sustained damage in service that required them to be

replaced. *Id.* at 1768:6-1773:20; 627:19 – 628:3, 755:3-14, 756;1-5, Deposition of Robert Favors at 33:15-34:9, 34:19-20, 35:1-23, 80:17-19, 80:24-81:18.

111. The condition of the work truck's companion tires and wheels showed that the tire experienced persistent abuse and a lack of proper maintenance. *Id.* at 1750:10-1773:20, Exhibit 1275 at 19, 26, 28, 29, Exhibit 1276 at 22, 44, 45, and 47, Exhibit 1277 at 19, 35.

112. Over-deflection means that a tire is either underinflated or it has been overloaded. Trial Tr.. at 1702:8-11. A tire is overloaded when it exceeds its load-carrying capacity.  Load-carrying capacity depends on tire inflation pressure. *Id.* at 1833:2-10. The physical evidence suggested the tire had been overdeflected. Overdeflected operation is a known cause of tire separation. *Id.* at 1478:25-1479:21.

113. The tire had a prominent rim-line compression groove, which is an indication of over-deflection. *Id.* 1703:13-15; 1686 ("more over-deflection you get, the more opportunity there is for this lower rim line area to literally flex over this wheel flange, and if it occurs for a long enough period of time, it actually starts to create a groove in the rubber."); *Id.* at 1687:15-24; 1705:13-14. To get the rim line compression groove in the tire, it took a chronic history of over-deflection. *Id.* at 1705:22-25.

114. The tire also had very wide and very polished, worn flanges. *Id.* at 1707:4-14. This meant that the tire was flexing all the way over the wheel flange. *Id.* at 1708:1-3. This also indicates that the tire was over-deflected. *Id.* at 1708:10-15.  Although other factors can cause polished flanges, the degree of polishing in the subject tire wheel flange generally does not occur without over-deflection. *Id.* at 1835:12-19.

115. Moreover, the tire was worn on the edge of the tread, or shoulder.  This means either the tire had significant wear or used in severe type of service. *Id.* at 1701:16-24; 1696:4-1702:21,

Exhibit 1270 at 108, 112. Areas of the tread were down to 2.5/32. A tire likely needs to be replaced when its tread reaches 2/32. This likely indicates that the tire saw significant over-deflection. *Id.* at 1702:3-11. When a tire is over-deflection, the load is carried on the edges of the tread or shoulder region of the tire. *Id.* at 1702:12-21.

116. Speed more likely than not contributed to the tread-belt separation, given the condition of the tire. The tire has a speed rating of 112 miles per hour, but "that's assuming the tire is in good condition and tire's been properly maintained, properly taken care of, has had proper inflation pressure and proper loading involved with it." *Id.* at 1695:1-5.

117. Moreover, the tire had a condition called a bead pullout caused by excessive heat from the brake system. *Id.* at 1714:11-1725:12, Exhibit 1279 at 16, 17, Exhibit 1273 at 1. This occurs when the steel hoops are pulled out of the structure of the tire. Bead pullouts are extremely rare. A bead pull out is consistent with extreme heat generated in the bead area of the tire. The heat breaks down the structure of the rubber and polyester components. A bead pullout can also be caused by excessive load or excessive speed. There were also melted polyester cords in the tire, indicating that the tire was seeing excessive heat. Trial Tr. at 1715; 1716:1-10. High-heat caused the structure of the tire to rip apart because of degradation in the bead area. *Id.* at 1716:16-18. In sum, the bead pull out along with the melted polyester cords indicate there was high-heat in the bead area of the tire. *Id.* at 1718:17-19; 1725:2-12.

118. The heat damage leading to the bead pullout to the tire was likely caused by overheating brakes. The heat causes the tire components to separate, leading to tire disablement. *Id.* at 1723:2- The brakes had been replaced 5,000 miles before the accident. Those previous brakes showed evidence of glazing which occurs when they get too hot and crystalize, impairing

their functionality.  *Id.* at 1207.  Brake glazing can occurring from continuous downhill braking or overloading.  *Id.* at 1207-1208.  The heat from the brakes can transfer to the tires.  *Id.* at 1210.

119. A run-flat did not appear to cause the bead pullout.  *Id.* 1850.  Excessive heat caused some polyester cords in the tire to burn, melt and break.  *Id.*  at 1852.  Once some cords burn and melt, others will rip.  *Id.*

120. The only apparent source of the temperature capable of melting polyester cords – 470 degrees- would be the brakes.  *Id.* at 1855-56.  The prior brakes were heavily glazed, indicating excessive heat was coming from the brakes.

121. Moreover, Mr. Carlson conducted a shearography examination of the right rear tire, a BF Goodrich tire.  He found evidence that the tire was undergoing an internal separation.  *Id.* at 338-39. He was not able to opine on the cause of the separation.  *Id.*  Mr. Grant opined that the BF Goodrich tire showed evidence of an internal separation and overdeflection.  *Id.* at 1759- 1763.

**H.     Other factors contributed to the accident.**

122. Defendant offered the testimony of Mr. Durisek, who gave expert opinion on accident reconstruction, vehicle measurement systems, and vehicle dynamics.  *Id.* at 1178:1-8. The Court finds his testimony credible and persuasive.

123. A tread-belt detachment does not necessarily cause a vehicle to go off the roadway.  A tread-belt detachment does not cause a sudden pull to one side.  *Id.* at 1193-94.

124. After the tread-belt detachment, the vehicle was controllable and Mr. Martinez could have safely slowed down.  *Id.* at 1192.  Mr. Martinez's speed and steering inputs contributed to the rollover.  Mr. Martinez steered off the roadway. There is a significant drop off from the roadway, and the truck ultimately overturned as Mr. Martinez was attempting to steer the truck back up the embankment.  *Id.* at 1196-97.

125. Mr. Martinez was driving 93 MPH in a 70 MPH zone when the tread-belt separation occurred. *Id.* at 582:25-583:3, 659:19-660:25, 1179:3-13. Mr. Martinez admitted that this speed was not safe. *Id.* at 662-63. This speed was not reasonable under the circumstances. Mr. Martinez was cited for speeding. *Id.* at 584.

126. After the tire failed, the truck deviated only slightly to the left. *Id.* at 479:14-19. There was no evidence of a sudden movement to the left. The vehicle continued to move relatively straight. Nevertheless, Mr. Martinez overcorrected in light of the speed he was traveling by turning the vehicle to the right. *Id.* at 1247-50; 672:6-673:9, 674:7-675:13. Even after the subject tire failed, the truck responded to his steering and braking inputs. *Id.* at 1247:23-1249:11.

127. The trailer did not have functioning brakes on any of its four wheels. *Id.* at 1243. The trailer weighed approximately 3,000 pounds empty. The trailer was required to have functioning brakes to operate safely attached to the Ford F-350. *Id.* at 1244. During the incident, this would have had a destabilizing effect on the vehicle. *Id.* at 1244-45. As Mr. Martinez applied heavy breaking, the trailer pushed the rear of the truck, adding an additional yaw movement to the back of the truck, pushing the rear of the truck out. *Id.* at 1245.

128. The tire disablement was controllable, and the vehicle had the ability to be driven safely and to stop on the shoulder. *Id.* at 1253; 1288. Mr. Martinez's excessive speed and his steering and braking inputs contributed to the rollover. *Id. at* 1244;1253. Had Mr. Martinez been going the speed limit, it is likely he would have been able to stop before he steered the vehicle off the road. *Id.* at 1250-51; 1253.

## CONCLUSIONS OF LAW[6]

---

[6] To the extent the above stated Findings of Fact contain any conclusions of law they are hereby incorporated herein, and *vice versa*.

129. The Court has jurisdiction over the subject matter and the parties. 28 U.S.C. § 1332(a). *See* Doc. 681 at 2 (stipulations). There is complete diversity between the parties, and the amount in controversy exceeds $75,000.

130. Venue is proper under 28 U.S.C. § 1391(b)(2). *See* Doc. 681 at 3 (stipulations).

131. As a federal court sitting in diversity, the law of the forum state applies to substantive issues and federal law applies to procedural issues. *Herrera v. Lufkin Industries, Inc.*, 474 F.3d 675, 683 (10th Cir. 2007). New Mexico is the forum state in this case, so New Mexico law will apply to the substantive issues currently before the Court.

132. This bench trial involved three New Mexico state law claims asserted by Plaintiffs: (1) negligence (Count II); (2) strict product liability (Count I); and (3) loss of consortium (Count VI). As explained above, the Court found there was no manufacturing or design defect in the tire. And based on the totality of the evidence, the Court concludes that Defendant exercised ordinary care and its product was reasonably safe for foreseeable use in light of all circumstances. UJI 13-1402 NMRA. Therefore, the Court concludes that Defendant is not liable under a negligence or strict product liability theory, and Plaintiffs' claims fail.

133. Alternatively, only to the extent Defendant were liable, the Court would further conclude that:

- Abuse or misuse contributed to the tread-belt separation;

- Punitive damages would not be appropriate; and

- Mr. Martinez and Trac-Work were comparatively negligent.

**I.**     **Defendant is not liable under the strict products liability claim (Count I).**

134. Plaintiffs asserted a strict products liability claim (Count I). Plaintiffs must prove that an unreasonable risk of injury resulted from a physical condition in the Subject Tire at the time it

was sold and the defect caused the tire's failure, Plaintiffs' injuries, and Mr. Portillo's death. *See* UJI 1406 NMRA[7]; UJI 13-1424 NMRA. The Court concludes that Plaintiff has not shown that the tire was defective or that an unreasonable risk of injury resulted from a condition of the tire.

135. New Mexico has adopted the Restatement (Second) of Torts § 402A (1965) as the standard for products liability cases. *Skyhook v. Jasper,* 90 N.M. 143, 146–47, 560 P.2d 934, 937–38 (1977), *overruled on other grounds by Klopp v. Wackenhut Corp.,* 113 N.M. 153, 157, 824 P.2d 293, 297 (1992).

136. For a strict products liability claim, the plaintiff must prove the following elements: (1) the product was defective; (2) the product was defective when it left the hands of the defendant and was substantially unchanged when it reached the user or consumer; (3) because of the defect, the product was unreasonably dangerous to the user or consumer; (4) the consumer was injured or damaged; and (5) the defective product was the proximate cause of the injury or damage. *Garner v. Raven Indus., Inc.,* 732 F.2d 112, 114 (10th Cir.1984) (citing *Tenney v. Seven–Up Co.,* 92 N.M. 158, 584 P.2d 205 (Ct.App.1978)).

137. New Mexico recognizes three types of defects: (1) manufacturing defects, (2) design defects, and (3) warning defects. *Fernandez v. Ford Motor Co.,* 118 N.M. 100, 109, 879 P.2d 101, 110 (Ct.App.1994).

138. New Mexico defines a defective product as one that creates "an unreasonable risk of injury resulting from a condition of the product or from a manner of its use. Such a risk makes the product defective. This rule applies even though all possible care has been used by the supplier in putting the product on the market." UJI 13–1406 NMRA.

> An unreasonable risk of injury is a risk which a reasonably prudent person having full knowledge of the risk would find unacceptable. This means that a product does not present an unreasonable risk of injury simply because it is possible to be harmed by it.

---

[7] Plaintiffs request that the Court apply New Mexico's uniform jury instructions. The Court has done so.

…
Under products liability law, you are not to consider the reasonableness of acts or omissions of the supplier. You are to look at the product itself and consider only the risks of harm from its condition or from the manner of its use at the time of the injury.

UJI 13-1407 NMRA; *see also Bustos v. Hyundai Motor Co.*, 2010-NMCA-090, 149 N.M. 1, at

*12 (citing UJI 13-1407 NMRA).

139. When considering whether a product is defective, the fact-finder is instructed to engage in "a risk-benefit calculation" and "balance meritorious choices for safety made by the manufacturer while minimizing the risk that the public will be deprived needlessly of beneficial products." *Smith*, 2001-NMCA-090, at ¶ 14. The Court may consider:

(1) the usefulness and desirability of the product...; (2) the availability of other and safer products to meet the same need...; (3) the likelihood of injury and its probable seriousness, i.e., 'risk,'...; (4) the obviousness of the danger...; (5) common knowledge and normal expectation of the danger (particularly for established products)...; (6) the avoidability of injury by care in use of the product (including the effect of instructions or warnings)...; and (7) the ability to eliminate the danger without seriously impairing the usefulness of the product or making it unduly expensive.

*McDonald v. Zimmer, Inc.*, 2020-NMCA-020, ¶ 33, 461 P.3d 930 (citing UJI 13-1407 NMRA, committee notes); *Brooks,* 120 N.M. at 379–80 n. 2, 902 P.2d at 61–62 n. 2, *quoted in Bustos v. Hyundai Motor Co.*, 2010-NMCA-090, ¶ 54, 149 N.M. 1, 13, 243 P.3d 440, 452 (noting that New Mexico Supreme Court has approved instruction 13-1406 and 1407 and constitutes the law trial courts should consider).

140. Plaintiffs do not assert that any tread-belt separation constitutes a defective condition. As explained above, the Court found that a tread-belt separation has many causes aside from a defect. "The mere fact that a failure or accident occurred is insufficient to support a strict products liability claim. There must be evidence of a defect." *Pac. Indem. Co. v. Therm-O-Disc, Inc.,* 476 F. Supp. 2d 1216, 1229 (D.N.M. 2006), *citing Skyhook,* 90 N.M. at 147, 560 P.2d at 938 (fact that accident occurred is not in itself sufficient to support finding that product was unreasonably

dangerous); *Springer Corp. v. Dallas & Mavis Forwarding Co., Inc.,* 90 N.M. 58, 60, 559 P.2d

846, 848 (Ct.App.1976) (evidence of tire blowout alone was not sufficient evidence of tire defect).

141. Rather, Plaintiffs assert that the subject tire had the following defective conditions:

- An open splice crack in the inner liner rather than the appropriate overlap splice;

- Adhesion defect in the cushion rubber; and

- A too thin inner liner which allowed oxygen and moisture into the structure of the tire, damaging the internal components and leading to a belt separation failures.

Doc. 748 at 106.  The Court disagrees, and as explained in detail in the findings of fact above,

finds or concludes that there was no defect in the tire:

- Defendant used an appropriate and well-made overlap splice;

- There was no adhesion defect in the tire; and

- The inner liner was not too thin and was reasonably and appropriately designed, measured and manufactured.

142. The subject tire was not defective and there was not an unreasonable risk of injury

resulting from a condition of the subject tire.  UJI 13-1406.  There was not a risk which a

reasonably prudent person having full knowledge of the risk would find unacceptable.  UJI 13-

1407.

143. "A defective product is a cause of injury if it contributes to bringing about the injury,

and the injury would not have occurred without it." UJI 13-1424 NMRA 2013.  The Court

concludes that no defective condition of the subject tire caused the injury or contributed to bringing

about the injury.  UJI 13-1424.

144. Damages are not appropriate.

145. Therefore, the Court concludes that Defendant is not liable under a strict products liability claim.

**II.**   <u>**Defendant was not negligent (Count II).**</u>

146. Plaintiffs also assert a negligence claim (Count II). Defendant acted as a reasonably prudent manufacturer and was not negligent.  Defendant acted reasonably, and exercised ordinary care in the manufacture, design, and inspection of the subject tire. As explained above, there was no defect in the tire.

147. To sustain a negligence claim under New Mexico law, a plaintiff must demonstrate "a duty from a defendant to a plaintiff, breach of that duty, which is typically based on a standard of reasonable care, and the breach being a cause-in-fact and proximate cause." *Nowell*, 372 F.Supp. 3d at 1225 (citing *inter alia*, *Herrera v. Quality Pontiac*, 2003-NMSC-018, ¶ 6, 134 N.M. 43). In determining whether a defendant has breached a duty owed to the plaintiff, the fact finder must ascertain "what a reasonably prudent person would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all the surrounding circumstances." *Herrera*, 2003-NMSC-018, at ¶ 33. This inquiry is inherently "factual," and requires the trier of fact to determine whether a defendant acted "reasonably or negligently" under the circumstances. *Id.*

148. Defendant as the manufacturer of the subject tire has the duty to use ordinary care to avoid a foreseeable risk of injury caused by a condition of the product or the manner it is used. *Smith ex. Rel. Smith v. Bryco Arms,* 2001-NMCA-090, 19, 131 N.M. 87, 94, 33 P.3d 638, 645, *citing* UJI 13-1402 NMRA. Ordinary care is defined as the "care which a reasonably prudent supplier would use in the conduct of its business." *Id. citing* 13-1404. "What constitutes ordinary care varies with the likelihood of an injury occurring and the seriousness of the harm which could

reasonably be expected. As the danger that should be foreseen increases, so the amount of care required also increases." *Id.* 13-1404.

149. Defendant did not breach its duty of ordinary care. The Court concludes that Defendant acted with reasonable care and as reasonably prudent manufacturer would in the design, inspection, and manufacture of the subject tire. Moreover, Defendant had in place reasonable procedures to prevent defective tires from entering the marketplace. The subject tire met Defendant's design requirements as well as Ford's requirements for use as original equipment. Surveillance testing and the performance of the subject tire met or exceeded the standard of care.

150. Plaintiffs appear to assert that Defendant was negligent by allowing the subject tire to leave the facility with a defective condition, including "inadequate adhesion in the cushion rubber, a defective inner liner splice, and/or an inner liner design that caused the tire to undergo the tread-belt separation that occurred on February 18, 2016 while it was in service on Plaintiffs' work truck." Plaintiffs' proposed findings of fact, Doc. 748 at 109. The Court disagrees. As explained above, the subject tire did not have a defective condition.

151. Plaintiffs also assert that Defendant was negligent as follows:

(a) inadequate inspection procedures which allowed the tire to leave the facility with an inner liner splice;

(b) allowing dangerous manufacturing conditions at its Mt. Vernon facility, (1) including a pay for performance scheme; and (ii) allowing roof leaks and contaminations;

(c) allowing inadequate quality controls for tires produced, when Defendant should have known that (i) manufacturing defects were common based on scrap data; (ii) its quality control system was inadequate because tires with visual defects were slipping passed inspectors; (iii) an

average of ▮▮▮▮▮ to examine each tire; and (iv) incentivizing inspectors to limit the number

of tires scrapped would result in defective tires entering the marketplace;

(d) failing to investigate based on warranty adjustment returns; and

(e) negligently or defectively designing and measuring the inner liner.

*See* Plaintiffs' proposed findings of fact and conclusions of law, Doc. 748 at 109-111.

152. Because the Court found there was no defective condition in the subject tire which

caused the tread-belt separation, it appears these alleged negligent acts are irrelevant.

Nevertheless, assuming they are still relevant, the Court disagrees with Plaintiffs' allegations. The

Court finds and/or concludes that none of these allegations are true. To the extent any of these

allegations are true or Defendant breached its duty of ordinary care in any of these practices, the

Court finds and/or concludes that Plaintiffs have not shown that it caused a defective condition in

the tire or caused the tread/belt separation. Thus, the Court finds and/or concludes that Plaintiff

has not proven any of the above proposed facts.  Rather, the Court finds and/or concludes that:

(a) Defendant had adequate inspection procedures as explained above in the findings of

fact and as demonstrated in part by the lack of defect in the subject tire;

(b) there were no dangerous manufacturing conditions at the Mt. Vernon facility.  The pay

for performance plan for inspectors was reasonable and did not lead to dangerous conditions.

There is insufficient evidence to suggest the subject tire was contaminated or that contamination

occurred in the building where the tire was produced. There is insufficient evidence to suggest

alleged dangerous conditions affected the subject tire;

(c) Defendant had reasonable and adequate quality controls at the Mt. Vernon facility, and

its inspection procedures were reasonable and adequate;

(d) there were no performance issues with the tires, and warranty adjustment returns are not persuasive evidence of performance issues; and

(e) the inner liner was not designed defectively, it was adequately thick, and was appropriately measured during manufacture.

153. Plaintiffs did not show there were widespread issues or dangerous conditions at the Mt. Vernon plant where the tire was made.  There was insufficient evidence to connect any condition at the plant with the alleged defects in the tire at issue.  Even assuming there was a dangerous condition at the plant at some time, it is merely speculative that condition affected the current tire.

154. Defendant's conduct did not proximately cause or contribute to the tread-belt separation. Defendant's conduct did not cause or contribute to Plaintiffs' injuries or Mr. Portillo's death.

155. Compensatory and punitive damages are not warranted.

156. Therefore, the Court concludes that Defendant is not liable under the negligence claim (Count II).

157. Alternatively, the circumstances of the use of subject tire that led to the tread-belt separation were not foreseeable. "The supplier has the duty to consider foreseeable risks of injury. This duty is limited to use of the product for a purpose or in a manner which could reasonably be foreseen.  Where an injury is caused by a risk or misuse of the product which was not reasonably foreseeable to the supplier, it is not liable." NMRA, Rule 13-1403

158.  As explained in the findings of fact, the tire was subjected to rugged and abusive service conditions during its service life.  The tire more likely than not failed due to the fact that it had a chronic history of over-deflected operation; there was excessive heat, caused by overheating

brakes, in the bead area of the tire; and the excessive speed of the truck and trailer, in light of the overall load of the truck and trailer and condition of the tires.  Doc. 726, Trial Tr. at 1725:20 – 1726:1.  This misuse or abuse of the tire was not reasonably foreseeable.

## III.   Loss of Consortium claim (Count VI) fails.

159. Ms. Irma Martinez asserts a loss of consortium claim.  Because the Court finds that Defendant is not liable under a strict products liability or negligence theory, the loss of consortium claim also fails.  *Archer v. Roadrunner Trucking Inc.*, 1997-NMSC-003, ¶ 12, 122 N.M. 703, 709, 930 P.2d 1155, 1161 (where defendant is not liable for underlying claim, derivative loss of consortium claim fails), *cited in Thompson v. City of Albuquerque*, 2017-NMCA-002, ¶ 17, 386 P.3d 1015, 1020, *aff'd*, 2017-NMSC-021, ¶ 17, 397 P.3d 1279.

## IV.   Punitive damages would not be appropriate.

160. Even assuming Defendant was liable, the Court would not find any aggravating circumstances, or that punitive damages were appropriate.

161. Punitive damages are appropriate if a defendant's conduct was willful, reckless, or wanton.  UJI 13-1827 NMRA.  A corporate defendant may be liable for punitive damages based on the willful, reckless or wanton conduct of the corporation's employees.  *Id.*

162. The Court finds and concludes that Defendant's conduct was not negligent, reckless, willful, or wanton.

## V.   Defendant's affirmative defenses.

163. Alternatively, only assuming Plaintiffs had proven Defendant liable, the Court would conclude that Defendant established the following affirmative defenses by a preponderance of the evidence, substantially reducing any damages award:

- The tire was abused or misused, contributing to the tread-belt separation; and

- Mr. Martinez and Trac-Work Inc were comparatively negligent.

41

164. Defendant has the burden of proving its affirmative defenses by a preponderance of the evidence.

> A user of a product …. has a duty to use ordinary care to avoid a foreseeable risk of injury caused by the condition of the product or a manner in which it is used. Ordinary care is that care exercised by a reasonably prudent person and varies with the nature of what is being done. As the danger that should reasonably be foreseen increases, the amount of care required also increases.

NMRA, Rule 13-1427.

165. First, Mr. Martinez's and Trac-Work's negligence clearly contributed to the tread-belt separation.  The tire was clearly misused or abused as explained above.   The tire more likely than not failed due to: a chronic history of over-deflected operation; excessive heat, caused by overheating brakes, in the bead area of the tire; and excessive speed of the truck and trailer, in light of the overall load of the truck and trailer and condition of the tires.  Doc. 726, Trial Tr. at 1725:20 – 1726:1.

166. Second, Mr. Martinez's negligent driving contributed to the accident.  The truck was controllable following the tread-belt separation.  Mr. Martinez drove 93 MPH in his F-350, while hauling a trailer which did not have functioning brakes.  Mr. Martinez was not eligible to drive the commercial motor vehicle at the time of the accident, as he had exceeded his maximum number of hours under the Federal Motor Carrier Safety Regulations.

167. Third, Trac-Work fell below the standard of care of a motor carrier in maintaining and operating the truck and training Mr. Martinez.

168. Mr. Martinez was responsible for maintenance inspection of the work truck and trailer and failed to exercise ordinary care.  Mr. Martinez delegated some responsibility to Mr. Munn. The tire pressure monitoring system was inoperable, tires were in poor condition, and the brakes on the trailer were inoperable.

169. Trac-Work failed to exercise ordinary care in its oversight of the maintenance of the work truck and trailer.  Trac-Work had a duty to ensure that its policies as to the operation of the work truck were being followed and the vehicle was roadworthy.  The work truck and trailer were in a dangerous condition at the time of the accident, and the dangerous condition of the truck contributed to the failure of the tire and the loss of control of the work truck during the accident.

170. Trac-Work also failed to exercise ordinary care in its oversight of its driver, Mr. Martinez.  It provided no formal training for operating the work truck and trailer, including tire failures.  Mr. Favors admitted that its trucks were often driven off road and experienced tire failures. Trac-Work did not adequately ensure that its employees or contractors were adequately adhering to its policies for the safe operation of the truck.  The tires showed evidence of being routinely over-deflected, that is either overloaded or underinflated.  Prior brakes were glazed, indicating they were likely overloaded.  Nevertheless, Trac-Work did not have adequate policies to ensure that tire pressure monitoring systems were working, and did not adequately ensure that the truck and trailer were not overloaded.  They did not have policies to ensure the trucks were routinely weighed.  Trac-Work in effect incentivized Mr. Martinez to speed by not paying its workers for return trips from work sites.

171. Trac-Work was negligent and contributed to the failure of the subject tire and the loss of control of the work truck during the accident.

172. The work truck and trailer combination driven at the time of accident constituted a commercial motor vehicle under the Federal Motor Carrier Safety Regulations and Trac-Work was a motor carrier that was required to meet the minimum standard set by the FMCSRs with regard to the qualification of drivers, vehicle maintenance and hours of service rules.  Compliance with governmental rules or standards may be considered as evidence of ordinary care, but they are not

conclusive. *See.* NMRA, UJI 13-1405. The purpose of these rules is to prevent commercial vehicle accidents and injuries. Trac-Work knew it had to comply with these regulations, as Mr. Martinez previously received a citation for 16 violations by the Texas Commercial Vehicle Enforcement while he was driving an F-350 and trailer combination. The citation included violations that only apply to commercial motor vehicles. The Court found Mr. Glennon's expert opinion persuasive that Trac-Work fell below the minimum standard as follows:

- Failing to weigh the work truck and keep records regarding what the work truck was carrying;

- Failing to ensure the work truck had a functioning tire pressure monitoring system;

- Failing to adequately inspect, repair, and maintain the work truck and it tires;

- Failing to document the inspection, repair, and maintenance of the work truck and its tires;

- Failing to ensure employees were properly trained to perform inspection and maintenance duties;

- Failing to keep and maintain a driver's log book, and allowing a commercial motor vehicle to be driven by an employee who had exceeded the maximum number of hours permitted under the FMCSR.

173. These acts demonstrate that Trac-Work fell below the minimum standard of care. This constituted comparative negligence that contributed to the accident and Plaintiffs' injuries.

174. Therefore, had Defendant been liable, the Court would have also found Mr. Martinez and Trac-Work were comparatively negligent and contributed to the accident and Plaintiffs' injuries.

**VI.** **<u>Court will seal this order as to trade secrets and issue a redacted version</u>.**

175. The Court has issued multiple orders sealing certain trade secrets or confidential business information.  For the reasons stated in the Court's prior orders, including its Order Granting Motions to Seal Portions of the Trial Transcript (Doc. 751), the Court will seal certain trade secrets.  In that order, the Court concluded that

> Defendant's proposed redactions are well taken, as they contain trade secrets or other confidential business information.
> Moreover, Defendant's interest in maintaining the confidentiality of trade secrets heavily outweighs the public's interest in reviewing testimony regarding trade secrets in the trial transcripts. Finally, the Court finds Defendant's proposed redactions are narrowly tailored.

*Martinez v. Cont'l Tire the Americas, LLC*, No. 117CV00922KWRJFR, 2023 WL 2914796, at *1 (D.N.M. Apr. 12, 2023).  The Court incorporates the reasoning of that order herein and finds its reasoning applies to the trade secrets or confidential business information in this order.  Therefore, the Court will seal this order, and issue a redacted order.

176. Within **fourteen days** after the filing of this order, the parties shall send a redacted version of this document to the court's chambers e-mail address. The proposed redactions should only include language which discloses trade secrets or confidential business information which has already been identified as confidential in prior orders or sealed. The redacted version shall obscure all protected information as identified in the court's prior orders and no more. If the redactions are acceptable to the court, the redacted version will be placed on the docket. If a proposed redacted opinion is not submitted to the Court, the Court will assume Defendant agrees this opinion may be viewed by the public and will be unsealed.

## CONCLUSION

In accordance with the foregoing findings of fact and conclusions of law this Court concludes that there was no defect in the subject tire manufactured by Defendant, and Defendant was not negligent. Plaintiffs' strict products liability claim (Count I), negligence claim (Count II),

and loss of consortium claim (Count VI) fail.  Therefore, the Court will issue a separate judgment in favor of Defendant as to each of Plaintiffs' remaining claims.

The parties shall submit a redacted version of this opinion to the Court's chambers e-mail address within **fourteen (14) days** of the entry of this order.

KEA W. RIGGS
UNITED STATES DISTRICT JUDGE